BROWNE GEORGE ROSS
O'BRIEN ANNAGUEY & ELLIS LLP
Keith J. Wesley (State Bar No. 229276)
  kwesley@bgrfirm.com
Matthew L. Venezia (State Bar No. 313812)
  mvenezia@bgrfirm.com
2121 Avenue of the Stars, Suite 2800
Los Angeles, California 90067
Telephone: (310) 274-7100
Facsimile: (310) 275-5697

Attorneys for Plaintiff
Kamille Faye Vinluan-Jularbal

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KAMILLE FAYE VINLUAN-JULARBAL, | Case No. 2:21-cv-00573-JAM-JDP |
| Plaintiff, | *Assigned to:  Hon. John A. Mendez* |
| vs. | |
| REDBUBBLE, INC., | **PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION** |
| Defendant. | Date:     July 27, 2021 |
| | Time:     1:30 P.M. |
| | Dept.:     6 |
| | Action Filed:  March 29, 2021 |

1830622.1

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that, on July 27, 2021, at 1:30 p.m., or as soon thereafter as it may be heard, in Courtroom 6 of the above-referenced Court, located at 501 I Street, Sacramento, CA 95814, the Honorable John A. Mendez presiding, plaintiff Kamille Faye Vinluan-Jularbal ("Plaintiff") will, and hereby does, move this Court to preliminarily enjoin defendant Redbubble, Inc. ("Redbubble") from selling or allowing the sales of counterfeit products on its website (the "Motion").

This Motion will be, and hereby is, made pursuant to Rule 65 of the Federal Rules of Civil Procedure. The Motion is based on the following grounds. Redbubble offers for sale and sells a massive volume of counterfeit products on its website, resulting in hundreds of millions of dollars in historical revenue to Redbubble. These counterfeit products include any well-known federally registered trademark one can think of. Despite being inundated with infringement lawsuits around the country, Redbubble has taken no steps to prevent the rampant counterfeiting on its website.

Plaintiff is but one victim of Redbubble's counterfeiting. When Plaintiff sought to purchase a United Nations hoodie, she was duped into purchasing a counterfeit from Redbubble. She did not intend to purchase a counterfeit, and would not have purchased the counterfeit United Nations hoodie from Redbubble had she known it was a knockoff. Redbubble made this sale in violation of the Lanham Act's counterfeiting provisions, and the California Consumers Legal Remedies Act's proscription on passing off goods. Plaintiff now seeks public injunctive relief, pursuant to California's Unfair Competition Law (based upon Redbubble's underlying violation of the Lanham Act) and Consumers Legal Remedies Act, enjoining Redbubble from selling or allowing the sale of counterfeit products on its website.

The Motion is based on this Notice of Motion, the Memorandum of Points and Authorities, the declarations of Kamille Faye Vinluan-Jularbal ("Vinluan-Jularbal Decl.), Keith J. Wesley ("Wesley Decl."), Matthew L. Venezia ("Venezia Decl."), Francisco Cuellar ("Cuellar Decl."), Phillip Paley ("Paley Decl."), Terri Walters ("Walters Decl."), Stan Friedlander ("Friedlander Decl."), the Request for Judicial Notice ("RJN"), and any other evidence and argument the Court may consider.

1      Plaintiff does not seek to present oral testimony at the hearing. Should the Court wish to

2   entertain attorney argument on the Motion, Plaintiff believes that no more than one hour should be

3   required.

4   DATED:  June 11, 2021                    BROWNE GEORGE ROSS
                                            O'BRIEN ANNAGUEY & ELLIS LLP
5                                                Keith J. Wesley
                                                Matthew L. Venezia
6

7                                        By:      */s/ Matthew L. Venezia*
                                                Matthew L. Venezia
8                                        Attorneys for Plaintiff
                                        Kamille Faye Vinluan-Jularbal
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    PRELIMINARY STATEMENT.......................................................................1

II.   STATEMENT OF FACTS..........................................................................3

    A.   The Redbubble platform.....................................................................3

        1.   Redbubble's sales of counterfeit products. .................................3

        2.   Redbubble's failure to police its website for infringements and the resulting infringement lawsuits. ..................................................5

        3.   Redbubble's sales process..........................................................6

    B.   Harm to Plaintiff and the public............................................................10

        1.   Plaintiff's unwitting purchase of counterfeit United Nations hoodie..........10

        2.   The deleterious effect of counterfeit products..............................11

III.  PLAINTIFF IS ENTITLED TO PUBLIC INJUNCTIVE RELIEF AGAINST REDBUBBLE'S PRACTICE OF SELLING COUNTERFEITS. ......................................12

    A.   Plaintiff is likely to succeed on the merits. ...............................................13

        1.   Redbubble's sale of counterfeit products is illegal. ....................................13

        2.   Redbubble's platform-level defenses will fail..............................................14

            a.   Redbubble is liable for direct trademark counterfeiting..................15

            b.   Redbubble is liable for contributory trademark counterfeiting. ....................................17

        3.   Redbubble's illegal conduct is actionable under both the UCL and CLRA. ..........................................................19

        4.   The UCL and CLRA provide for public injunctive relief. ..........................20

    B.   Plaintiff and the public-at-large will suffer irreparable harm absent injunctive relief. ..........................................................20

    C.   The equities are in Plaintiff's favor........................................................22

    D.   The requested injunction is in the public interest......................................23

    E.   Plaintiff should not be required to post a bond, or alternatively, be required to post only a nominal bond. ..........................................................24

IV.  CONCLUSION. ........................................................................25

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION

# **TABLE OF AUTHORITIES**

**Page**

## **FEDERAL CASES**

*AMF Inc. v. Sleekcraft Boats*,
  599 F.2d 341 (9th Cir. 1979)................................................................................13

*Atari Interactive, Inc. v. Redbubble, Inc.*,
  No. 18-cv-03451-JST, 2021 WL 706790 (N.D. Cal. Jan. 28, 2021) ............................15, 16, 18

*Athleta, Inc. v. Pitbull Clothing Co.*,
  No. CV 12–10499–CAS, 2013 WL 142877 (C.D. Cal. Jan. 7, 2013) ......................................21

*Barahona-Gomez v. Reno*,
  167 F.3d 1228 (9th Cir. 1999)................................................................................24, 25

*Boardman v. Pac. Seafood Group*,
  822 F.3d 1011 (9th Cir. 2016)................................................................................13

*Booth v. McManaman*,
  830 F. Supp. 2d 1037 (D. Haw. 2011) ................................................................24, 25

*Born to Rock Design Inc. v. CafePress.com, Inc.*,
  No. 10 Civ. 8588(CM), 2012 WL 3954518 (S.D.N.Y. Sep. 7, 2012)......................................14

*Brookfield Commc'ns, Inc. v. West Coast Ent. Corp.*,
  174 F.3d 1036 (9th Cir. 1999)................................................................................23

*Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*,
  766 F.2d 1319 (9th Cir. 1985)................................................................................24

*Chanel v. Veronique Idea Corp.*,
  795 F. Supp. 2d 262 (S.D.N.Y. 2011) ................................................................14

*Coach, Inc. v. Goodfellow*,
  717 F.3d 498 (6th Cir. 2013)................................................................................18

*Coach, Inc. v. Horizon Trading USA Inc.*,
  908 F. Supp. 2d 426 (S.D.N.Y. 2012) ................................................................14

*CytoSport, Inc. v. Vital Pharm., Inc.*,
  617 F. Supp. 2d 1051 (E.D. Cal. 2009) *aff'd*, 348 Fed. Appx. 288 (9th Cir. 2009) ..................21

*DiCarlo v. MoneyLion, Inc.*,
  988 F.3d 1148 (9th Cir. 2021)................................................................................20

*East Bay Sanctuary Covenant v. Trump*,
  349 F. Supp. 3d 838 (N.D. Cal. 2018) ................................................................25

# TABLE OF AUTHORITIES
### (Continued)

**Page**

*Edge v. City of Everett*,
    929 F.3d 657 (9th Cir. 2019)................................................................................13

*Greg Young Publ'g, Inc. v. Zazzle, Inc.*,
    785 Fed. Appx. 417 (9th Cir. 2019) ....................................................................14

*Guthrie Healthcare Sys. v. ContextMedia, Inc.*,
    826 F.3d 27 (2d Cir. 2016) .................................................................................23

*H–D U.S.A., LLC v. SunFrog, LLC*,
    311 F. Supp. 3d 1000 (E.D. Wis. 2018) ..............................................................14

*Herb Reed Enters., LLC v. Florida Ent. Mgmt., Inc.*,
    736 F.3d 1239 (9th Cir. 2013) ............................................................................21

*Inwood Labs., Inc. v. Ives Labs. Inc.*,
    456 U.S. 844 (1982) .....................................................................................21, 23

*Leiva-Perez v. Holder*,
    640 F.3d 962 (9th Cir. 2011)..............................................................................13

*Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*,
    658 F.3d 936 (9th Cir. 2011) .........................................................................17, 18

*Moroccanoil, Inc. v. Moroccan Gold, LLC*,
    No. CV 08-05356-RGK, 2008 WL 11411416 (C.D. Cal. Dec. 23, 2008) ................23

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*,
    290 F.3d 578 (3rd Cir. 2002)..............................................................................23

*Original Appalachian Artworks, Inc. v. Granada Elecs., Inc.*,
    640 F. Supp. 928 (S.D.N.Y.1986)...................................................................21, 24

*Phillip Morris USA Inc. v. Shalabi*,
    352 F. Supp. 2d 1067 (C.D. Cal. 2004)........................................................14, 21, 23

*PoloFashions, Inc. v. Craftex, Inc.*,
    816 F.2d 145 (4th Cir. 1987)..............................................................................14

*Rosetta Stone Ltd. v. Google, Inc.*,
    676 F.3d 144 (4th Cir. 2012) ..............................................................................18

*Sanrio Co. v. J.I.K. Accessories*,
    No. C–09–0440 EMC, 2012 WL 1366611 (N.D. Cal. Apr. 19, 2012) ....................23

# TABLE OF AUTHORITIES
### (Continued)

**Page**

*Save Our Sonoran, Inc. v. Flowers*,
408 F.3d 1113 (9th Cir. 2005) .................................................................25

*Shuting Kang v. Harrison*,
No. 3:18-cv-05399-JD, 2019 WL 4645723 (N.D. Cal. Aug. 13, 2019) ....................24

*Swan v. Tanjuakio*,
No. 21-00052 JMS-KJM, 2021 WL 1794756 (D. Haw. May 5, 2021) ....................24

*Taylor-Failor v. County of Hawaii*,
90 F. Supp. 3d 1095 (D. Haw. 2015) ........................................................25

*The Ohio State University v. Redbubble, Inc.*,
989 F.3d 435 (6th Cir. 2020) ...............................................................15

*Usrey v. Chen*,
No. CV 14-1134-GW(AJWx), 2014 WL 12570232 (C.D. Cal. May 29, 2014) .................21, 23

*Wecosign, Inc. v. IFG Holdings, Inc.*,
845 F. Supp. 2d 1072 (C.D. Cal. 2012) .....................................................23

*Winter v. Natural Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ........................................................................13

*Y.Y.G.M. SA v. Redbubble, Inc.*,
No. 2:19-cv-04618-RGK-JPR, 2020 WL 3984528 (C.D. Cal. July 10, 2020) .................18, 19

**STATE CASES**

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*,
20 Cal. 4th 163 (1999) ...................................................................19

*Industrial Indem. Co. v. Apple Computer, Inc.*,
79 Cal. App. 4th 817 (1999) ..............................................................19

*Kwikset Corp. v. Superior Court*,
51 Cal. 4th 310 (2011) ...................................................................20

*McGill v. Citibank, N.A.*,
2 Cal.5th 945 (2017) .....................................................................20

**FEDERAL STATUTES**

15 U.S.C. § 1116(a) ..........................................................................21

15 U.S.C. §§ 1116(a), (d)(1)(A) ..............................................................22

Too low

**TABLE OF AUTHORITIES**
(Continued)

**Page**

15 U.S.C. §§ 1116(d)(1)(A) ...............................................................20

15 U.S.C. § 1117(c), 1116(d)(1)(A), 1125(a) ...............................13

18 U.S.C. § 2320(b)(1) .......................................................................13

Public Law 104–153 (110 Stat. 1386, July 2, 1996) ..........................11

**STATE STATUTES**

Cal. Bus. & Prof. Code § 17204 ..................................................19, 20

Cal. Civ. Code § 1770(a)(1) ..............................................................19

Cal. Civ. Code § 1780(a)(2) .......................................................19, 20

**RULES**

Federal Rules of Civil Procedure Rule 65(c) ....................................24

**OTHER AUTHORITIES**

Department of Homeland Security, *Combating Trafficking in Counterfeit and Pirated Goods, Report to the President of the United States*, 7 (Jan. 24, 2020)....................................11

Jeremy M. Wilson & Rod Kinghorn, *The Global Risk of Product Counterfeiting: Facilitators of the Criminal Opportunity* ...............................................11

4 McCarthy on Trademarks & Unfair Competition § 25:10 (5th ed. 2021)...........................13

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.      PRELIMINARY STATEMENT.**

Redbubble has sold hundreds of millions of dollars' worth of counterfeit goods on www.redbubble.com, and even in the face of eight active federal infringement lawsuits against it, Redbubble's counterfeiting remains wide-ranging and brazen. It is well past time for Redbubble to be seen for the criminal counterfeiting enterprise that it is. With Redbubble's sales soaring past $320 million US in 2020, the swift entry of preliminary injunctive relief is required to protect consumers and intellectual property holders, and Plaintiff thus brings this Motion seeking preliminary public injunctive relief against Redbubble's sales of counterfeit products pursuant to California's Unfair Competition Law and Consumers Legal Remedies Act.

Plaintiff is but one of the countless customers that has been swindled by Redbubble into purchasing its counterfeit products, relevantly, a counterfeit United Nations hoodie, pictured below, side-by-side with some authentic United Nations products.





It is not surprising that Redbubble tricked Plaintiff, along with what is likely millions of other customers. To the untrained eye, Redbubble appears to be operating a legitimate business. Its

products appear alongside authentic, licensed products in Google search results, and are strategically targeted at potential customers using Google AdSense. Common experience thus tells us that, for example, a potential customer that has searched on Google for "dallas cowboys t-shirt" would later be targeted with Redbubble's knockoff version, pictured herein.[1]

Contrary to what Redbubble will argue, this is not the exception to the rule, or the result of a few bad actors. While Redbubble is not the only company that allows users to upload designs to its platform to be offered for sale printed on a variety of products, it is a bad actor within the space, flatly refusing to take the common-sense precautions against infringement implemented by many of its competitors. For instance, Redbubble conducts no vetting or monitoring of new users, does not proactively search for infringing designs absent a specific complaint from an intellectual property owner, and refuses to disable keyword tags and searches using well-known trademarks, like "dallas cowboys". The result is that Redbubble is overrun with counterfeits, and Redbubble's revenues dwarf that of most of its competitors, owing primarily to the sales of those counterfeits. Some examples of Redbubble counterfeits are below.



Despite being inundated with infringement litigation across the country, Redbubble simply

---

[1]     This has even happened to Plaintiff's counsel, who has been targeted by Redbubble's ads for counterfeit Atari-related merchandise, while litigating an infringement case against Redbubble on behalf of Atari. Venezia Decl., ¶¶ 2–4 & Exh. C.

1  refuses to clean up its act. Plaintiff thus asks this Court to enjoin Redbubble from selling or

2  allowing the sale of counterfeit products on its website—conduct that is already illegal under the

3  Lanham Act's counterfeiting provisions. This relief is entirely warranted, and should be regarded

4  as unremarkable. If Redbubble hired printers in its parent company's home country of Australia

5  (or elsewhere overseas) to manufacture its counterfeit products, the products would be seized by

6  customs at the border. Redbubble should fare no better under U.S. counterfeiting law simply

7  because it chose to set up an office in San Francisco and hire U.S. printers to manufacture its

8  counterfeit products.

9  **II.   STATEMENT OF FACTS.**

10       **A.   The Redbubble platform.**

11            **1.   Redbubble's sales of counterfeit products.**

12       Redbubble is stocked with counterfeit merchandise, emblazoned with the federally-

13  registered trademarks from any well-known brand one could think of. *See* Paley Decl., Exh. J;

14  Cuellar Decl., Exh. H. The examples are endless, but a few examples are provided below for the

15  Court's reference.



-3-

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION



Paley Decl., Exh. J.

Nor are these examples outliers. The depth of counterfeit items for sale on Redbubble is further evidenced by reviewing the amount of counterfeit items available for popular brands. By way of illustration, the below screenshot shows the first twelve search results for "Calvin Klein" at the time of the search (similar items go on for pages, and they are all knockoffs).

Cuellar Decl., Exh. H.

1    Sales of counterfeit merchandise fuel a large percentage of Redbubble's annual revenue,

2   which reached $416.3 million AU in 2020 ($322.7 million US). Paley Decl., Ex. N, 4, 16. While

3   the exact percentage of revenues resulting from infringing sales requires discovery, Redbubble's

4   2019 Annual Report brags that 76% of its product revenue originated from "authentic sellers." *Id.*

5   at Exh. M, 5, 13. Plaintiff is skeptical, but even taking Redbubble at its word, that means

6   Redbubble sold $46.56 million US worth of "inauthentic" products in 2019 alone (the remaining

7   24% of sales multiplied by Redbubble's 2019 revenue). *Id.* at 4, 5, 13.

8        **2.    Redbubble's failure to police its website for infringements and the**

9             **resulting infringement lawsuits.**

10    Redbubble refuses to remove counterfeit products from its website absent a specific

11   complaint from the intellectual property owner, its website explaining:

12          [C]ontent is only removed when it has been specifically identified as
          infringing in a legally valid takedown notice. We generally don't go
13          looking for similar works to remove from the marketplace.

14   Paley Decl., Ex. K. By way of illustration, no matter how many obvious Nike counterfeits are for

15   sale on www.redbubble.com, Redbubble will not monitor its website for nor remove the

16   counterfeit items, unless it receives correspondence from Nike identifying the particular items

17   individually and requesting that they be removed.

18    Further, even where such a complaint is received, Redbubble refuses to disable searches

19   for infringing brands, for instance, by blocking searches for or tagging items with "Nike"—this

20   being the industry standard for other print-on-demand websites. RJN, Ex. V (Gerson Report), ¶

21   32. Redbubble also fails to promptly suspend the accounts of users selling counterfeit items, with

22   Counterfind identifying 412 instances where Redbubble users were allowed three or more

23   violations before their accounts were suspended (in one instance a seller was allowed 34

24   violations). *Id.* at ¶¶ 33–36.[2]

25    The result is widespread counterfeiting on Redbubble's website, and, predictably,

26   _____

27   [2]    Counterfind works on behalf of intellectual property holders to locate infringements on
     Redbubble, and other similar platforms, and send takedown notices. These numbers reflect only
28   Counterfind clients, and are thus understated when it comes to any platform-wide analysis.

numerous infringement lawsuits against Redbubble. Redbubble was previously found liable for infringement by two courts in its home country of Australia, in relation to Pokémon's and Hells Angels' trademarks. RJN, Exhs. T, U. And, Plaintiff is aware of *eight* currently pending federal trademark and copyright infringement lawsuits against Redbubble:

- *The Ohio State University v. Redbubble, Inc.*, Case No. 2:17-cv-01092-ALM-CMV in the Southern District of Ohio.

- *Atari Interactive, Inc. v. Redbubble, Inc.*, Case No. 4:18-cv-03451-JST in the Northern District of California.

- *Y.Y.G.M. SA v. Redbubble, Inc.*, Case No. 2:19-cv-04618-RGK-JPR in the Central District of California.

- *Tomelleri v. Redbubble, Inc.*, Case No. 4:20-cv-05879-KAW in the Northern District of California.

- *YZ Productions, Inc. v. Redbubble, Inc.*, Case No. 5:20-cv-06615-LHK in the Northern District of California.

- *CanvasFish.com, LLC v. Redbubble, Inc.*, Case No. 1:21-cv-00164-RJJ-SJB in the Western District of Michigan.

- *Chrome Hearts LLC v. Redbubble, Inc.*, Case No. 2:21-cv-01946-FMO-AGR in the Central District of California.

- *Deadly Doll, Inc. v. Redbubble Inc.*, Case No. 2:21-cv-01944-JFW-PLA in the Central District of California.

### 3. Redbubble's sales process.

Redbubble operates a print-on-demand website. Redbubble users upload designs onto the Redbubble website, and customers can purchase items, such as t-shirts, emblazoned with those designs. Wesley Decl., Exh. A (Deshais Depo.), 30:8–20 & Exh. 1068. Redbubble does not maintain stock of the items listed for sale on its website, but instead facilitates the printing of those items when ordered, *i.e.*, on-demand. *Id.* at 43:22–44:6.

Once a Redbubble user uploads a design, that design is virtually affixed by Redbubble onto Redbubble's model photos, and is then hosted on Redbubble's website in a product listing. *See, e.g.*, Paley Decl., Exh. J. A sample product listing hosted on Redbubble's website is below.



*Id.*

This particular product is emblazoned with an exact copy of the iconic Nike mark with the accompanying "Swoosh"—a blatant counterfeit. If the imagery did not make that clear, the listing is titled "nike Classic T-Shirt." The listing has the Redbubble logo at the top left, and discusses the fit of the t-shirt the design is to be printed on. Lastly, the listing states that it was "designed by" (*not* sold by) one of Redbubble's users.

Redbubble uses its Redbubble-generated product images in its paid advertisements with search engines and social media platforms such as Google, Facebook, and Instagram, spending

tens of millions of dollars on the ads yearly. Wesley Decl., Exh. B (Toy Depo.), 48:18–49:17 & Exh. 1060 at 4. Redbubble's advertisements also appear on numerous third-party websites through Google AdSense, for instance, CNN.com. Venezia Decl., ¶¶ 2–4 & Exh. C. These advertisements feature a thumbnail of the final product photos created by Redbubble, often alongside authentic, licensed products from companies like Trevco. *Id.*; Paley Decl., Exh. I. Examples are below.[3]



Lured to Redbubble's website by such advertisements, a customer who then decides to purchase an item can do so by adding the item to his or her shopping cart, and checking out on the Redbubble website. Wesley Decl., Exh. A (Deshais Depo.), 55:1–7, 62:1–18; Walters Decl., ¶¶ 2, 5. Redbubble processes the payment itself (*i.e.*, takes the money) and provides an order confirmation, accepting the customer's offer to purchase the item. Wesley Decl., Exh. A (Deshais Depo.), 55:1–7, 62:19–23; Walters Decl., ¶¶ 5–7 & Exhs. R, S. A sample order confirmation is below.

---

[3]    The Missile Command trademark and copyrighted missile launch design used on the Redbubble t-shirt are intellectual property owned by the iconic video game company Atari.



Notably, this screenshot shows the next two steps—"Made and Shipped" and "Est. Delivery"—on a page that only references Redbubble.

Next, the customer will receive a shipping confirmation from Redbubble. Walters Decl., ¶ 3 & Exh. P. When the order arrives, it will be in a Redbubble shipping container, with the products placed in individual Redbubble bags. *Id.* at ¶¶ 4, 8 & Exh. Q; Wesley Decl., Exh. A (Deshais Depo.), 63:18–65:14. The products will also have a removable Redbubble tag. *Id.* Representative samples of this packaging are below.



1   Should there be an issue with the product, the tag advises the customer to contact Redbubble

2   concerning returns, and in fact, Redbubble handles all returns/refunds and customer service issues.

3   Wesley Decl., Exh. A (Deshais Depo.), 43:4–20, 56:2–6, 65:15–66:1 & Exh. 1068.

4         While Plaintiff understands that Redbubble hires third-party printers to manufacture its

5   products, Redbubble exercises significant control over its printing partners and the products

6   themselves. Redbubble's GM Products explained that Redbubble "work[s] really closely with our

7   suppliers to make sure the product is suitable to the local market." Venezia Decl. Exh. E, 0:49–

8   0:53. As a specific example, Redbubble's SVP, Global Operations provided:

9               We also have our quality manager physically visit every single
                fulfiller and perform quality controls at the location of printing to
10              make sure that the blank products, whether it's a t-shirt or a phone
                case, or the printing performs to our expectations.
11

12  *Id.* at Exh. F, 2:00–2:16. Redbubble goes to these lengths understanding that the products

13  manufactured by the third-party printers are perceived in the marketplace to be sold by Redbubble.

14  *Id.* at Exh. E, 1:44–1:52 ("[W]e have a team of product developers whose job it is to make sure

15  that all Redbubble products fit to the Redbubble standard.").

16        **B.    Harm to Plaintiff and the public.**

17             **1.    Plaintiff's unwitting purchase of counterfeit United Nations hoodie.**

18        Like many other Redbubble customers, Plaintiff unwittingly purchased a counterfeit

19  product from Redbubble (a knockoff United Nations hoodie). Vinluan-Jularbal Decl., ¶¶ 2–9;

20  RJN, Exhs. X, Y (federal trademark registrations for the United Nations logo, registered to the

21  United Nations Organisation, not Redbubble or its user). Plaintiff was lured to Redbubble's site

22  during her search for a United Nations hoodie, seeking to replace her husband's old favorite

23  hoodie, which also had the United Nations logo emblazoned on the front. Vinluan-Jularbal Decl.,

24  ¶¶ 2, 3. To be clear, Plaintiff did not know the United Nations hoodie was counterfeit when she

25  ordered it, and had she known, Plaintiff would not have ordered the product. *Id.* at ¶¶ 6–10.[4]

26  _____

27  [4]     It is difficult, if not impossible, for an untrained person such as Plaintiff to determine
    whether a particular item offered for sale on Redbubble is authentic or counterfeit, particularly
28  given that Redbubble has now entered into a handful of partnerships with brand owners, which are

1    Indeed, Plaintiff's purchase was motivated by an affinity for the United Nations, and

2  Plaintiff presumed that by purchasing a United Nations hoodie, she would be supporting the

3  organization monetarily, and allowing her husband to continue to wearing a United Nations

4  hoodie. *Id.* at ¶¶ 2, 8, 10. In addition to being upset that she did not in fact support the United

5  Nations with her purchase, Plaintiff suffered embarrassment and humiliation by virtue of having

6  been tricked into purchasing an illegal counterfeit, and what Plaintiff hoped would be a thoughtful

7  gift to her husband was ruined. *Id.* at ¶¶ 10, 11.

8                **2.      The deleterious effect of counterfeit products.**

9    Counterfeiting is a long-recognized, serious drain on the economy, and a threat to both

10  brand owners and consumers. Indeed, Congress made the following findings when passing the

11  Anticounterfeiting Consumer Protection Act of 1996:

12              The counterfeiting of trademarked and copyrighted merchandise—

13              (1) has been connected with organized crime;

14              (2) deprives legitimate trademark and copyright owners of
                substantial revenues and consumer goodwill;

15              (3) poses health and safety threats to United States consumers;

16
                (4) eliminates United States jobs; and
17
                (5) is a multibillion-dollar drain on the United States economy.
18

19  Public Law 104–153 (110 Stat. 1386, July 2, 1996).

20    Much has been written concerning the persistent dangers of counterfeiting, particularly in

21  today's online economy. *See, e.g.*, Department of Homeland Security, *Combating Trafficking in*

22  *Counterfeit and Pirated Goods, Report to the President of the United States*, 7 (Jan. 24, 2020)

23  ("While the expansion of e-commerce has led to greater trade facilitation, its overall growth—

24  especially the growth of certain related business models—has facilitated online trafficking in

25  counterfeit and pirated goods."); Jeremy M. Wilson & Rod Kinghorn, *The Global Risk of Product*

26  *Counterfeiting: Facilitators of the Criminal Opportunity*, A-CAPP BACKGROUNDER (2015) (On

27  _____

28  not disclosed on the product listing pages themselves. Paley Decl., Exh. L.

the internet, "[c]ounterfeiters have a distinct advantage over other start-up businesses because they have chosen a product that is already successful in the marketplace and in demand. Any Internet searches by consumers for legitimate products will likely display sites offering counterfeit products as well.").[5]

Many well-known brands view the proliferation of counterfeiting as "the number one risk to price erosion, brand integrity, and long-term sales increase or decrease." Friedlander Decl., ¶¶ 33–39 (discussing the views of well-known brands on the harms of counterfeiting). Because of this concern, and to combat online counterfeiting, particularly by Redbubble, licensing professional Chris Lucero explains that brand owners are forced to engage in counter measures, such as retaining companies like Counterfind, "to combat the revenue [they lose] to these infringers and the negative comments from official licensees, legitimate retailers and consumers." RJN, Exh. W (Lucero Report), ¶ 65.

And, to the extent Redbubble would suggest some of its customers may be knowing participants when purchasing counterfeits on its site, such argument is undercut by evidence demonstrating that customers are generally upset after discovering they received a counterfeit product. Friedlander Decl., ¶ 41 ("During my employment at Amazon, numerous complaints were received from consumers that unwittingly purchased counterfeit products from merchants."). Plaintiff's complaints here "are consistent with the types of complaints about counterfeit products that [former Amazon executive Mr. Friedlander has] seen during [his] time in e-commerce, and typical of a consumer that has unwittingly purchased a counterfeit product." *Id.* at ¶ 45; *see also id.* at ¶ 42 (Amazon focus groups suggest customers are concerned they may receive a counterfeit product when shopping online).

### III.   PLAINTIFF IS ENTITLED TO PUBLIC INJUNCTIVE RELIEF AGAINST REDBUBBLE'S PRACTICE OF SELLING COUNTERFEITS.

The party seeking a preliminary injunction must show it "'is likely to succeed on the

---

[5]      Available at:  https://a-capp.msu.edu/wp-content/uploads/2018/05/PC_Opportunity_Backgrounder_FINAL.pdf (last accessed June 9, 2021).

1    merits'; (2) it 'is likely to suffer irreparable harm in the absence of preliminary relief'; (3) 'the

2    balance of equities tips in [its] favor'; and (4) 'an injunction is in the public interest.'" *Boardman*

3    *v. Pac. Seafood Group*, 822 F.3d 1011, 1020 (9th Cir. 2016) (quoting *Winter v. Natural Res. Def.*

4    *Council, Inc.*, 555 U.S. 7, 20 (2008)). Plaintiff satisfies each of these requirements.

5            **A.**     **Plaintiff is likely to succeed on the merits.**

6          "Likelihood of success on the merits is the most important factor[.]" *Edge v. City of*

7    *Everett*, 929 F.3d 657, 663 (9th Cir. 2019). However, in order to justify the issuance of a

8    preliminary injunction, Plaintiff need only demonstrate "that she has a substantial case for relief

9    on the merits[,]" which is something less than "showing that success is more likely than not."

10   *Leiva-Perez v. Holder*, 640 F.3d 962, 967–68 (9th Cir. 2011). Here, Plaintiff is far more likely to

11   succeed on the merits because (1) the sale of counterfeits is well-established to be illegal; (2)

12   Redbubble's platform-level defenses will fail; (3) Redbubble's illegal conduct is actionable by

13   Plaintiff under both the UCL and CLRA; and (4) the UCL and CLRA provide for public

14   injunctive relief.

15           **1.**     **Redbubble's sale of counterfeit products is illegal.**

16         Generally speaking, a counterfeit mark "is a false mark that is identical with, or

17   substantially indistinguishable from, the genuine mark." 4 MCCARTHY ON TRADEMARKS &

18   UNFAIR COMPETITION § 25:10 (5th ed. 2021). Under the Lanham Act, the use of a counterfeit

19   mark is illegal, with the intellectual property holder having a number of remedies, for example, up

20   to $2,000,000 in statutory damages per violation, and seizure of the counterfeit goods. 15 U.S.C. §

21   1117(c), 1116(d)(1)(A), 1125(a). Indeed, knowingly trafficking in counterfeit goods is a serious

22   criminal offense, punishable for an individual by up to 10 years in jail for a first offense, and up to

23   20 years for a second offense, or if the offender is an entity, by up to a $5 million fine for the first

24   offense, and up to $15 million for the second offense. 18 U.S.C. § 2320(b)(1).

25         That massive quantities of counterfeit products are sold and offered for sale by Redbubble

26   on www.redbubble.com cannot be seriously disputed. *See* Cuellar Decl., Exh. H; Paley Decl., Exh.

27   J. While courts in trademark infringement cases ordinarily consider the factors set forth in *AMF*

28   *Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979) to determine whether a likelihood

1   of confusion exists, where a counterfeit mark is used, likelihood of confusion must be presumed.

2   *PoloFashions, Inc. v. Craftex, Inc.*, 816 F.2d 145, 148–49 (4th Cir. 1987) (use of a counterfeit

3   mark "so unassailably established" the likelihood of confusion as to warrant summary judgment

4   on liability); *Coach, Inc. v. Horizon Trading USA Inc.*, 908 F. Supp. 2d 426, 433 (S.D.N.Y. 2012)

5   (same); *Chanel v. Veronique Idea Corp.*, 795 F. Supp. 2d 262, 267 (S.D.N.Y. 2011) (same);

6   *Phillip Morris USA Inc. v. Shalabi*, 352 F. Supp. 2d 1067, 1073 (C.D. Cal. 2004) (same).[6]

7                      **2.      Redbubble's platform-level defenses will fail.**

8            Courts have uniformly held print-on-demand companies liable for sales of counterfeit or

9   infringing products on their websites, where the companies themselves manufacture the infringing

10  goods, with one leading case holding that the business model results in a "fairly straightforward

11  case of counterfeiting." *H–D U.S.A., LLC v. SunFrog, LLC*, 311 F. Supp. 3d 1000, 1023 (E.D.

12  Wis. 2018); *see also Greg Young Publ'g, Inc. v. Zazzle, Inc.*, 785 Fed. Appx. 417, 418 (9th Cir.

13  2019) (holding there was sufficient evidence in the record to support a finding of willful copyright

14  infringement by the jury); *Ohio State Univ. v. Skreened Ltd.*, F. Supp. 3d 905, 915, 922 (S.D. Ohio

15  2014) (granting summary judgment against print-on-demand company for trademark infringement

16  and counterfeiting); *Born to Rock Design Inc. v. CafePress.com, Inc.*, No. 10 Civ. 8588(CM),

17  2012 WL 3954518, at *5–6 (S.D.N.Y. Sep. 7, 2012) (holding print-on-demand business model

18  results in "use in commerce" sufficient to support trademark infringement claims).

19           Here, Redbubble will not argue that any of the products in evidence are genuine. Instead,

20  Redbubble will attempt to distinguish itself from the above-cited cases by arguing that Redbubble

21  does not manufacture the counterfeit goods offered for sale on its website—a third party is hired to

22  do so—such that Redbubble cannot be deemed to have "used" the counterfeit marks itself. This

23  argument is spurious, and is now being rejected by courts around the country.

24

25

26  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
    [6]    *Arcona, Inc. v. Farmacy Beauty, LLC* came out the other way only because the products
27  there were not copies—the challenged mark had several obvious differences from that of the
    plaintiff. 976 F.3d 1074, 1078 (9th Cir. 2020) ("Perhaps recognizing that the two products look
28  little like each other, Arcona argues . . .").

a.   **Redbubble is liable for direct trademark counterfeiting.**

Well-reasoned decisions have found that trademark counterfeiting claims against Redbubble presented triable issues of fact sufficient to defeat Redbubble's summary judgment motions because of the unremarkable proposition that a reasonable jury could find Redbubble to be the seller of the products sold on www.redbubble.com.

In *The Ohio State University v. Redbubble, Inc.*, the Sixth Circuit reversed a previous order granting Redbubble summary judgment, explaining:

> [A]lthough the record is sparse, it appears that products ordered on Redbubble's website do not yet exist, come into being only when ordered through Redbubble, and are delivered in Redbubble packaging with Redbubble tags.

989 F.3d 435, 448 (6th Cir. 2020). On those facts alone, the Sixth Circuit held that "the district court erred in affirmatively placing Redbubble on the passive end of the liability spectrum." *Id.*

Similarly, in *Atari Interactive, Inc. v. Redbubble, Inc.*, Judge Tigar denied Redbubble's motion for summary judgment on liability for direct trademark counterfeiting, noting that, among other things, the sales process on www.redbubble.com results in a sales contract between Redbubble and the customers, and that the evidence showing Redbubble's control over every aspect of the sales process made Redbubble look much like SunFrog.[7] No. 18-cv-03451-JST, 2021 WL 706790, at *5–6 (N.D. Cal. Jan. 28, 2021) ("*Atari*").

Plaintiff is likely to succeed in demonstrating that Redbubble engages in direct trademark counterfeiting because Plaintiff has put the same evidence in the record that Redbubble controls every aspect of the sales process on www.redbubble.com:

***First***, Redbubble hosts product listing pages on its website where the counterfeit designs are affixed to Redbubble's stock model photos to show Redbubble customers what the final, printed product will look like. Paley Decl., Exh. J. These listing pages discuss the qualities of the physical products, for example, representing that (1) a hoodie is "Ethically sourced following the

---

[7]      A $19.2 million judgment was entered against SunFrog as a result of its counterfeiting of Harley-Davidson's trademarks, in one of the seminal print-on-demand decisions.

1    World Responsible Apparel Practices Standards"; (2) stickers are "Super durable and water-

2    resistant"; and (3) a phone case has "Impact resistant polycarbonate shell and shock absorbing

3    inner TPU liner". *Id.*

4         **Second**, Redbubble places advertisements for the products listed for sale on its website

5    using, among other platforms, Google AdSense. Wesley Decl., Exh. B (Toy Depo.), 48:18–49:17

6    & Exh. 1060 at 4. When a potential customer searches for a particular trademark on Google,

7    Redbubble is listed as the seller of the resulting products hosted on Redbubble's website, often

8    next to authentic sellers. Paley Decl., Exh. I. And, when potential customers are targeted with ads

9    on third-party websites like CNN.com, again, only Redbubble is identified. Venezia Decl., ¶¶ 2–4

10   & Exh. C.

11        **Third**, when Redbubble customers want to purchase a product listed for sale on

12   Redbubble's website, they complete the purchase entirely on Redbubble's website. Wesley Decl.,

13   Exh. A (Deshais Depo.), 55:1–7, 62:1–18; Walters Decl., ¶¶ 2, 5. Redbubble takes the customer's

14   money, promises to ship the product to the customer, and provides an order confirmation ("We're

15   on it!"). Wesley Decl., Exh. A (Deshais Depo.), 55:1–7, 62:19–23; Walters Decl., ¶¶ 5–7 & Exhs.

16   R, S. This process creates a binding sales contract between Redbubble and the customer. *See*

17   *Atari*, 2021 WL 706790, at *6 ("Atari's evidence shows that the customer forms a contract with

18   Redbubble, not the artist.").

19        **Fourth**, Redbubble coordinates with a third-party printing partner to manufacture the item

20   ordered on its website. Redbubble exercises control over these printers, by, among other things,

21   conducting site visits to ensure that products meet the "Redbubble standard." Venezia Decl., Exh.

22   E, 1:44–1:52 & Exh. F, 2:00–2:16. Redbubble also instructs its printing partners to include

23   Redbubble-branded packaging and tags with the products, and provides directions for shipping,

24   with customers selecting the manner of, and paying for, shipping on Redbubble's website. Walters

25   Decl., ¶¶ 4, 8 & Exh. Q; Wesley Decl., Exh. A (Deshais Depo.), 44:22–45:13, 63:18–65:14.

26   Redbubble, not its printing partners, maintain agreements with the common carriers used to

27   deliver Redbubble products. Wesley Decl., Exh. A (Deshais Depo.), 45:14–45:22.

28        **Fifth**, Redbubble handles all customer service and returns for the products sold on its

website. Wesley Decl., Exh. A (Deshais Depo.), 43:4–20, 56:2–6, 65:15–66:1 & Exh. 1068. Redbubble customers have no contact with Redbubble's users or the printers hired by Redbubble to manufacture the goods. *Id.*

For all these reasons, the obvious is true—Redbubble is the seller of the items sold on www.redbubble.com.

Redbubble's anticipated efforts to compare itself to eBay or Amazon fail, as former Amazon executive Stan Friedlander explains:

> [I]t is my opinion that Redbubble is not substantially similar to either Amazon Marketplace or eBay.  Because Redbubble coordinates the manufacturing of items that did not previously exist, and handles every aspect of the sales made on its website, including shipping, customer service, and returns, and Redbubble's products arrive in Redbubble packaging, the more apt comparison would be to products sold directly by Amazon, including in Amazon's print-on-demand shop.

Friedlander Decl, ¶ 19; *see also id.* at ¶¶ 12–17 (comparing the Amazon Marketplace and eBay platforms to Redbubble). And, when comparing Redbubble to Amazon's print-on-demand, "Redbubble falls far short of the type of precautions Amazon takes to avoid counterfeiting in its print-on-demand offering[.]" *Id.* at ¶ 32. For instance, while Amazon conducts manual vetting and monitoring of new users to its print-on-demand platform, and promptly bans users that submit any counterfeit designs, Redbubble conducts no vetting of new users, and allows infringers multiple counterfeiting violations prior to taking disciplinary action. *Id.* at ¶¶ 21, 22, 25–27; RJN, Exh. V (Gerson Report), ¶¶ 33–36.[8]

**b.      Redbubble is liable for contributory trademark counterfeiting.**

Redbubble may be held liable for contributory trademark counterfeiting where it has "[d]irect control and monitoring of the instrumentality used by a third party to infringe" and "continue[s] to supply its services to one who it knew or had reason to know was engaging in trademark infringement[.]" *Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*, 658 F.3d 936,

---

[8]      Cases oft-cited by Redbubble concern the third-party Amazon Marketplace, not direct sales from Amazon, or Amazon's print-on-demand.

942 (9th Cir. 2011) (internal quotation omitted). Both *Atari* and *Y.Y.G.M. SA v. Redbubble, Inc.*,

No. 2:19-cv-04618-RGK-JPR, 2020 WL 3984528 (C.D. Cal. July 10, 2020) ("*Brandy Melville*")

denied Redbubble's motions for summary judgment on contributory infringement, necessarily

finding that a reasonable jury could hold Redbubble liable.

In *Atari*, Judge Tigar explained that Redbubble could be held liable for contributory

trademark counterfeiting if it allowed users that Redbubble knew were engaging in infringement

access to its platform. 2021 WL 706790, at *11 (citing *Louis Vuitton Malletier, S.A. v. Akanoc

Solutions, Inc.*, 658 F.3d 936, 943 (9th Cir. 2011); *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d

144, 163–65 (4th Cir. 2012)). Consistent with this principal, Atari's contributory trademark

counterfeiting claims defeated summary judgment because Atari presented evidence, in the form

of an expert report from Ms. Gerson, that Redbubble allows known infringers to continue use of

its website, in one instance, allowing a user 34 violations. *Id.* at *11. Plaintiff offers the same

evidence here, demonstrating that Redbubble continues to allow repeat-infringers to upload

designs to its website. RJN, Exh. V (Gerson Report), ¶¶ 33–36 (Counterfind reporting 412

instances where Redbubble users were allowed three or more violations before their accounts were

suspended, with one user allowed 34 violations).

In *Brandy Melville*, plaintiff argued that to the extent Redbubble did not have actual

knowledge, it was only because Redbubble engaged in "ostrich-like practices[,]" *i.e.*, willful

blindness, as explained in *Coach, Inc. v. Goodfellow*, 717 F.3d 498, 505 (6th Cir. 2013). Again,

the sheer number of infringements on Redbubble's website, Redbubble's own admission that 24%

of its sales come from inauthentic sellers, and Redbubble's practice of not searching for

infringements absent specific notice from the rights holder all support a finding of willful

blindness. Paley Decl., Exhs. J, K, M, 5, 13; Cuellar Decl., Exh. H. On a similar evidentiary record

as is present here, Judge Klausner explained:

> The Court finds Brandy Melville's argument persuasive. A company
> such as Redbubble could hypothetically maintain a state of "willful
> blindness" simply by understaffing its marketplace integrity
> organization relative to the amount of content on its site. This would
> allow such a company to simultaneously claim that its employees
> were doing everything in their limited power to prevent the sale of
> infringing products, while also enjoying the benefit of substantial

1    revenue from the many infringing sales they were unable to catch.

2    *Brandy Melville*, 2020 WL 3984528, at *7.

3        In summary, while Judge Tigar and Judge Klausner got there in different ways (actual

4    knowledge vs. willful blindness), both agreed that a reasonable jury could find Redbubble liable

5    for contributory trademark counterfeiting. Plaintiff submits that the evidence here would support

6    summary judgment *against Redbubble*, but Plaintiff need not satisfy such a demanding standard—

7    Plaintiff has plainly met its burden to show "likelihood of success" in establishing Redbubble is

8    liable for contributory infringement.

9              **3.**     **Redbubble's illegal conduct is actionable under both the UCL and**

10                **CLRA.**

11       "By proscribing any unlawful business practice, section 17200 [California's Unfair

12   Competition Law] borrows violations of other laws and treats them as unlawful practices that the

13   unfair competition law makes independently actionable." *Cel-Tech Commc'ns, Inc. v. Los Angeles*

14   *Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999). Plaintiff thus has standing to challenge

15   Redbubble's violation of the Lanham Act's anti-counterfeiting provisions through California's

16   UCL, so long as she "has suffered injury in fact and has lost money or property as a result of the

17   unfair competition." Cal. Bus. & Prof. Code § 17204.

18       Similarly, the CLRA provides that "[p]assing off goods or services as those of another" is

19   a proscribed unlawful practice. Cal. Civ. Code § 1770(a)(1); *see also Industrial Indem. Co. v.*

20   *Apple Computer, Inc.*, 79 Cal. App. 4th 817, 828–29 (1999) ("passing off" is a broader remedy for

21   trademark infringement that "does not include the element of trademark registration, nor does it

22   require an unregistered mark distinctive enough to merit protection as a common law trademark").

23   The CLRA provides Plaintiff standing to obtain an injunction against the practice (amongst other

24   remedies), so long as she "suffer[ed] any damage as a result[.]" Cal. Civ. Code § 1780(a), (a)(2).

25       Plaintiff plainly suffered an injury and damages as a result of Redbubble's sale of

26   counterfeit products. At issue in the present motion is the counterfeit United Nations hoodie that

27   Plaintiff unwittingly purchased for $43.21. Dkt. 10-5, 2. The product Plaintiff received was of *no*

28   *value* to her, given that Plaintiff did not want a counterfeit United Nations hoodie. Vinluan-

1   Jularbal Decl., ¶ 9. In this regard, it is worth noting that what Plaintiff received was an illegal

2   product, subject to seizure and destruction. 15 U.S.C. §§ 1116(d)(1)(A), 1118.

3        Nonetheless, even if Redbubble argues Plaintiff received some value because she received

4   a functional hoodie, Plaintiff still suffered a loss because certainly a blank hoodie costs less than

5   what Plaintiff paid—Redbubble still had to pay the third-party printer to emblazon the hoodie with

6   the counterfeit United Nations mark—and Plaintiff did not bargain for a blank hoodie. *See Kwikset*

7   *Corp. v. Superior Court*, 51 Cal. 4th 310, 329–30 (2011) ("A counterfeit Rolex might be proven to

8   tell the time as accurately as a genuine Rolex and in other ways be functionally equivalent, but we

9   do not doubt the consumer (as well as the company that was deprived of a sale) has been

10  economically harmed by the substitution in a manner sufficient to create standing to sue.").

11           **4.    The UCL and CLRA provide for public injunctive relief.**

12       Both the UCL and CLRA expressly provide for injunctive relief. Cal. Civ. Code §

13  1780(a)(2); Cal. Bus. & Prof. Code § 17204. Under either the UCL or CLRA, a plaintiff may seek

14  public injunctive relief against "unlawful acts that threaten future injury to the general public."

15  *McGill v. Citibank, N.A.*, 2 Cal. 5th 945, 955 (2017). The Ninth Circuit recently explained that

16  "[p]ublic injunctive relief is 'relief that by and large benefits the general public ... and that benefits

17  the plaintiff, if at all, only incidentally and/or as a member of the general public.'" *DiCarlo v.*

18  *MoneyLion, Inc.*, 988 F.3d 1148, 1152 (9th Cir. 2021) (quoting *McGill*, 2 Cal. 5th at 955 (2017)).

19       This is the type of relief Plaintiff seeks here. Plaintiff's proposed injunction would enjoin

20  Redbubble from selling or allowing the sale of counterfeit products on its website. This would

21  prevent other potential Redbubble customers from being tricked into buying counterfeit products,

22  and would further protect the interests of intellectual property holders and the market in general by

23  eliminating a massive amount of illegal counterfeits.

24        **B.    Plaintiff and the public-at-large will suffer irreparable harm absent injunctive**

25               **relief.**

26       Because plaintiff seeks public injunctive relief, the Court must consider irreparable harm to

27  be suffered by the public-at-large should an injunction not issue. *See DiCarlo*, 988 F.3d at 1152;

28  *McGill*, 2 Cal. 5th at 955. The irreparable harm caused by Redbubble's counterfeiting to the

1    public-at-large cannot be understated.

2         Primarily, the Lanham Act includes a statutory "presumption of irreparable harm upon a

3    finding of . . . likelihood of success on the merits for a violation identified in this subsection in the

4    case of a motion for a preliminary injunction or temporary restraining order." 15 U.S.C. §

5    1116(a).[9] Plaintiff has shown a likelihood of success in demonstrating that Redbubble violates the

6    Lanham Act by selling counterfeit products, as set forth in detail above, and is thus entitled to this

7    statutory presumption of irreparable harm.

8         To the extent Redbubble argues this presumption relates to irreparable harm caused to

9    trademark holders, such argument is of no event, because those trademark holders are part of the

10   public-at-large for which Plaintiff seeks public injunctive relief. That a consumer would bring

11   such a claim is particularly apt because "[i]t is well established that trademark law protects not

12   only the private interests of the trademark owner but also the public's interest in not being

13   confused by the infringing products." *Phillip Morris USA*, 352 F. Supp. 2d at 1075 (citing *Inwood

14   Labs., Inc. v. Ives Labs. Inc.*, 456 U.S. 844, 854 n.14 (1982)); *see also Original Appalachian

15   Artworks, Inc. v. Granada Elecs., Inc.*, 640 F. Supp. 928, 932 (S.D.N.Y.1986) ("[T]he purchasing

16   public is an unnamed party in every action for trademark infringement.).

17        While the burden is on Redbubble to rebut this irreparable harm presumption, Plaintiff's

18   experience is helpful in illustrating additional types of irreparable harms faced by consumers.

19   Plaintiff intended to support the United Nations when she purchased a purported United Nations

20   hoodie, but failed to do so, with the United Nations receiving no portion of the sales proceeds.

21   Vinluan-Jularbal Decl., ¶¶ 8, 10. It is fair to assume other members of the public have similar

22   motivations when purchasing branded merchandise. For example, the proud parent of a UCLA

23   student who desires to support the school when buying a "UCLA Dad" sweatshirt fails to do so

24   _____

25   [9]     This statutory presumption codified prior holdings "that losing control over trademarks, and with them, control over business goodwill and reputation, constitutes irreparable injury justifying injunctive relief." *Usrey v. Chen*, No. CV 14-1134-GW(AJWx), 2014 WL 12570232, at

26   *7 (C.D. Cal. May 29, 2014) (citing *Herb Reed Enters., LLC v. Florida Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013); *Athleta, Inc. v. Pitbull Clothing Co.*, No. CV 12–10499–CAS

27   (FMOx), 2013 WL 142877, at *10 (C.D. Cal. Jan. 7, 2013); *CytoSport, Inc. v. Vital Pharm., Inc.*, 617 F. Supp. 2d 1051, 1080 (E.D. Cal. 2009), *aff'd*, 348 Fed. Appx. 288 (9th Cir. 2009).

28

1830622.1

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION

1   when buying the sweatshirt from Redbubble. A later refund of the parent's purchase price may

2   address the lack of value in the sweatshirt, but it does nothing to fulfill the customer's desire to

3   support the trademark holder.

4            Moreover, take for example the Redbubble customer that unwittingly purchases a

5   counterfeit Nike t-shirt, thinking they were receiving a good deal, only to later find out they

6   purchased (and have been wearing) a knockoff. The revelation that one has unintentionally

7   purchased or worn a knockoff could easily be a source of embarrassment and humiliation. Plaintiff

8   herself explained that she would not have knowingly purchased a counterfeit United Nations

9   hoodie, and that the revelation that she had done so caused her embarrassment and humiliation,

10  specifically ruining what was meant to be a thoughtful gift to her husband. Vinluan-Jularbal Decl.,

11  ¶¶ 9, 11; *see also* Friedlander Decl., ¶ 45 (noting that Plaintiff's complaint was typical of other

12  customer complaints about counterfeiting that he has witnessed as an e-commerce executive).

13           Lastly, that trademark counterfeiting should be swiftly enjoined, as opposed to only

14  compensated with damages later, is set forth in the United States Code's counterfeiting provisions.

15  That is, to combat counterfeiting, Congress set forth a statutory scheme where trademark

16  counterfeiting is subject to injunctive relief on an ex parte basis and the counterfeit goods are then

17  subject to seizure and destruction (not to mention the serious criminal penalties for those

18  trafficking in counterfeits). 15 U.S.C. §§ 1116(a), (d)(1)(A); 1118.

19           With Plaintiff making a clear showing that Redbubble actively engages in counterfeiting,

20  and Redbubble brazenly refusing to stop, it would be antithetical to the law's disdain for

21  counterfeiting to not enjoin the behavior and prevent the attendant irreparable harm.

22       **C.       The equities are in Plaintiff's favor.**

23           The balance of the equities tips strongly in Plaintiff's favor. As explained above,

24  Redbubble's continued counterfeiting harms both the owners of the counterfeited marks, and the

25  customers that are tricked into purchasing Redbubble's counterfeit products. *See, supra,* §§ II.B.,

26  III.A.3., III.B. With the massive volume of counterfeit products for sale and being sold on

27  Redbubble's website, the likely harms to rights holders and customers during the pendency of this

28  case are significant.

1    As to any potential harm to Redbubble, "Plaintiff is only seeking to enjoin illegal activity.

2  The injunction will not adversely affect any of [Redbubble's] legitimate business operations, nor

3  will they suffer any cognizable hardship as a result of its issuance." *Phillip Morris USA*, 352 F.

4  Supp. 2d at 1075. Courts consistently find that infringers have no interest in being allowed to

5  continue infringing. *See, e.g., Usrey*, 2014 WL 12570232, at *8 ("[T]he harm that flows from not

6  being able to continue infringing activities is generally minimally relevant to the balance of

7  hardships."); *Wecosign, Inc. v. IFG Holdings, Inc.*, 845 F. Supp. 2d 1072, 1084 (C.D. Cal. 2012)

8  (balance of harms is in favor of injunction where "an injunction will only proscribe Defendants'

9  infringing activities"); *Sanrio Co. v. J.I.K. Accessories*, No. C–09–0440 EMC, 2012 WL 1366611,

10  at *5 (N.D. Cal. Apr. 19, 2012) ("Defendant Lee would not be burdened by the injunction, as she

11  does not have the right to infringe upon Plaintiff's marks and is not licensed to sell Hello Kitty

12  products."); *see also Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer*

13  *Pharm. Co.*, 290 F.3d 578, 596 (3rd Cir. 2002) ("[T]he injury a defendant might suffer if an

14  injunction were imposed may be discounted by the fact that the defendant brought that injury upon

15  itself").

16    **D.    The requested injunction is in the public interest.**

17    Plaintiff seeks to protect the quintessential public interest involved in trademark

18  infringement matters—"consumers['] . . . ability to distinguish among the goods of competing

19  manufacturers." *Inwood Labs.*, 456 U.S. at 854 n.14; *see also Guthrie Healthcare Sys. v.*

20  *ContextMedia, Inc.*, 826 F.3d 27, 50 (2d Cir. 2016) ("An important beneficiary of the trademark

21  system is the public. The public has a great interest in administration of the trademark law in a

22  manner that protects against confusion."); *Brookfield Commc'ns, Inc. v. West Coast Ent. Corp.*,

23  174 F.3d 1036, 1066 (9th Cir. 1999) (injunction against infringement "promote[s] the public

24  interest in protecting trademarks generally"); *Moroccanoil, Inc. v. Moroccan Gold, LLC*, No. CV

25  08-05356-RGK (PLAx), 2008 WL 11411416, at *7 (C.D. Cal. Dec. 23, 2008) ("As the public has

26  a right not to be deceived or confused, the public interest and goals of the Lanham Act favor an

27  injunction in this case."); *Phillip Morris USA*, 352 F. Supp. 2d 1075 ("trademark law protects

28  not only the private interests of the trademark owner but also the public's interest in not being

1   confused by the infringing products"); *Original Appalachian Artworks*, 640 F. Supp. at

2   932("[T]he purchasing public is an unnamed party in every action for trademark infringement.").

3   Plaintiff was confused by Redbubble's use of the United Nations mark, resulting in her

4   unwittingly purchasing a counterfeit United Nations hoodie, and seeks to protect the public from

5   similar confusion caused by the sales of counterfeits on Redbubble's website.

6       This public interest is ingrained in the federal anti-counterfeiting laws, and last year, was

7   reiterated by the Department of Homeland Security in a report prepared for the President.

8   Department of Homeland Security, *supra*, 11; *see also* Wilson & Kinghorn, *supra*, 11–12

9   (discussing scope of the counterfeiting problem); Friedlander Decl., ¶¶ 33–46 (explaining harms

10  caused by Redbubble's counterfeiting). The public interest in preventing counterfeiting here is

11  thus not only important conceptually, but large in scale given the current widespread proliferation

12  of counterfeiting—with Redbubble being a major offender.

13      **E.    Plaintiff should not be required to post a bond, or alternatively, be required to**

14          **post only a nominal bond.**

15      Rule 65(c) of the Federal Rules of Civil Procedure provides the Court with "discretion as

16  to the amount of security required, if any." *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th

17  Cir. 1999). Here, Plaintiff should not be required to post a bond, or alternatively, be required to

18  post only a nominal bond.

19      ***First***, Plaintiff is exceedingly likely to succeed on the merits of her claims against

20  Redbubble. The strength of Plaintiff's claims on the merits mitigates any likelihood of prejudice to

21  Redbubble and "tips in favor of a minimal bond or no bond at all." *Shuting Kang v. Harrison*, No.

22  3:18-cv-05399-JD, 2019 WL 4645723, at *2 (N.D. Cal. Aug. 13, 2019) (quoting *Cal. ex rel. Van*

23  *De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1326 (9th Cir. 1985)); *see also Swan v.*

24  *Tanjuakio*, No. 21-00052 JMS-KJM, 2021 WL 1794756, at *8 (D. Haw. May 5, 2021) (same).

25      ***Second***, any "harm" that Redbubble could incur would result from its inability to continue

26  profiting from the selling counterfeit goods in violation of the Lanham Act. But, the inability to

27  violate applicable laws does not create "damages" as set forth in Rule 65(c). *Booth v.*

28  *McManaman*, 830 F. Supp. 2d 1037, 1045 (D. Haw. 2011) ("[T]here is no realistic likelihood that

1  Defendant will be harmed by an order requiring compliance with federal laws that DHS is already

2  obligated to follow.").

3      **Third**, even if the Court believed Redbubble could suffer damages as a result of the

4  preliminary injunction requested here, the Court does not have discretion to "set such a high bond

5  that it serves to thwart citizen actions[.]" *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126

6  (9th Cir. 2005). Consistent with this principle, courts routinely waive any bond requirement or

7  require only a nominal bond where, as here, plaintiffs seek relief in the public interest and are not

8  of considerable means. *See, e.g., Barahona-Gomez*, 167 F.3d at 1237 (upholding entry of nominal

9  $1,000 bond where "[t]he court specifically noted the public interest underlying the litigation and

10 the unremarkable financial means of the class as a whole"); *Taylor-Failor v. County of Hawaii*, 90

11 F. Supp. 3d 1095, 1102–03 (D. Haw. 2015) (requiring no bond); *Booth*, 830 F. Supp. 2d at 1045–

12 46 (same); *see also East Bay Sanctuary Covenant v. Trump*, 349 F. Supp. 3d 838, 868–69 (N.D.

13 Cal. 2018) (waiving bond where matter is of public interest and balance of equities weigh in favor

14 of legal and social service organization plaintiffs).

15 **IV.    CONCLUSION.**

16     For the reasons set forth above, Plaintiff respectfully requests that the Court enjoin

17 Redbubble from selling or allowing the sale of counterfeit products on its website.

18 DATED:  June 11, 2021                BROWNE GEORGE ROSS
                                       O'BRIEN ANNAGUEY & ELLIS LLP
19                                         Keith J. Wesley
                                           Matthew L. Venezia
20

21                                     By:      */s/ Matthew L. Venezia*
                                                Matthew L. Venezia
22                                     Attorneys for Plaintiff
                                       Kamille Faye Vinluan-Jularbal
23

24

25

26

27

28

## <u>CERTIFICATE OF SERVICE</u>

**Kamille Faye Vinluan-Jularbal v. Redbubble, Inc.**
**<u>Case No. 2:21-cv-00573-JAM-JDP</u>**

I hereby certify that on this 11th day of June, 2021, I electronically filed the

foregoing **PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY**

**INJUNCTION** with the Clerk of the Court using the CM/ECF system which will send

notification of such filing to the following:

KENNETH B. WILSON                    *Attorneys for Defendant*
ken@coastsidelegal.com                *REDBUBBLE, INC.*
COASTSIDE LEGAL
455 1st Avenue
Half Moon Bay, California 94019
Telephone:     (650) 440-4211
(No hard copies e-mails only)

JOSHUA M. MASUR
jmasur@zuberlawler.com
ZUBER LAWLER LLP
2000 Broadway Street, Suite 154
Redwood City, California 94063
Telephone:     (213) 596-5620
Facsimile:     (213) 596-5621

MATTHEW E. HESS
mhess@zuberlawler.com
ZUBER LAWLER LLP
350 S. Grand Avenue, 32nd Floor
Los Angeles, California 90071
Telephone:     (213) 596-5620
Facsimile:     (213) 596-5621

_____
Andrea A. Augustine